UNITED STATES *v.* J. H. COTTMANN & Co. (No. 3282)[1]

United States Court of Customs and Patent Appeals, June 4, 1930

*Charles D. Lawrence*, Assistant Attorney General (*Oscar Igstaedter*, special attorney, of counsel), for the United States.

*Janney, Ober, Slingluff & Williams, De Vries & Davis* (*Marion F. De Vries, Stuart S. Janney*, and *Jesse P. Crawford* of counsel) for appellee.

*Curtis, Fosdick & Belknap* (*L. R. Mason* of counsel) *amicus curiæ*.

[Oral argument April 15, 1930, by Mr. Igstaedter, Mr. Janney, Mr. Crawford, and Mr. Mason]

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, affirming the decision of a single justice

[1] T. D. 44095.

sitting in a reappraisement proceeding. The subject matter in issue is succinctly stated by the court below as follows:

These are applications for review made by the collector from a decision of the trial court covering importations of phosphate rock from Morocco. The merchandise was entered at prices ranging from $6.50 to $7 per ton, less the cost of freight which varied from $2.05 to $2.50 per ton, according to the port from which it was shipped. When the invoices and entries came before the appraiser for the purpose of appraisement he suspected dumping. A finding of dumping was made by the Secretary of the Treasury on phosphate rock from Morocco under date of February 9, 1928, and reported under T. D. 42577. Thereupon the appraiser made appraisements under the antidumping act of 1921 and found that the foreign market value on the date of purchase and the foreign market value on the date of exportation was in reappraisement 81809–A, $7.52 per ton; and in reappraisements 81810–A to 81819–A, inclusive, $7.58 per ton; and that the purchase price of the merchandise covered by reappraisements 81809–A, 81818–A, and 81819–A was $4.95 per ton; reappraisement 81810–A, $5 per ton; and reappraisements 81811–A to 81817–A, inclusive, $4 per ton. It is noted that the purchase price as found by the appraiser is the same as the entered value in all of the reappraisements under consideration.

A trial was had before Justice Sullivan, sitting in reappraisement, and a decision was rendered by him, published in T. D. 43306 and Circular No. 1385. Judge Sullivan found that there was a market value for this merchandise for home consumption in Morocco, and there being a market value in Morocco which was lower than the purchase price, the price at which the merchandise was entered, he found that antidumping law did not apply, and sustained the entered value in all of the reappraisements.

## Section 205 of the Antidumping Act of May 27, 1921, 19 U. S. C. A. 164, provides:

SEC. 205. That for the purpose of this title the foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time of exportation, the foreign market value shall be ascertained as of the date of such purchase or agreement to purchase. In the ascertainment of foreign market value for the purposes of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

The Government contends that the court below erred in finding that there was a market for phosphate rock "in the ordinary course of trade for home consumption" in Morocco within the meaning of said section 205.

It appears from the record that the phosphate rock in issue is from mines owned by the Moroccan Government, and is mined therefrom by a Government agency known as the Office Cherifien des Phosphates, which was created and is owned by the Government of Morocco.

The Government claims that in September, 1921, a contract was entered into by certain officials acting for the Moroccan Government and the O. C. P. on the one hand, and a French citizen on the other, whereby the latter obligated himself to erect at Casablanca a plant for the manufacture of superphosphate from raw phosphate rock, which plant was to have a minimum capacity of 24,000 tons of superphosphate per annum, and the O. C. P. was to supply the plant with raw phosphate rock on certain terms and conditions, which it did. The Government further contends that such terms and conditions were material elements affecting the price which the superphosphate works paid for the phosphate rock sold to it.

Upon the trial of this case before the single justice, the Government offered in evidence a collective exhibit, which was marked for identification as "Collective Exhibit C." This exhibit embraced three documents, one of which is entitled "Vizerial Decree of 26th November, 1921 (25 Rebin I, 1340)," granting approbation of a contract for the construction of a superphosphate factory at Casablanca. This contract is set out in the exhibit and is the one immediately above referred to.

Counsel for the importer objected to the admission of said Exhibit C in evidence upon the general ground that it was "incompetent, irrelevant, and immaterial," and the trial justice refused its admission on the ground, as we interpret what was said, that it did not establish value, and that the importer was not bound by it, having had nothing to do with the decree of the Government. To this ruling the Government excepted. In the appeal to the third division error was assigned upon this ruling, and the court, in its decision appealed from, sustained the action of Justice Sullivan. This is assigned as error before us.

The suggestion made by the single justice in excluding the exhibit that the importer was not bound by it is true only to a limited extent. The importer relies upon sales to the superphosphate works as establishing market value of phosphate rock for home consumption in Morocco, and to the extent that he so relies he is bound by any competent evidence establishing the character of such sales.

Our conclusion is that this collective Exhibit C bears a relationship to the issue herein which renders it proper to be considered with all of the other evidence in the case, and that the Customs Court erred in affirming its rejection by the single justice.

Section 501 of the Tariff Act of 1922 provides:

Sec. 501. * * * In finding such value * * * reports or depositions of consuls * * * may be considered. Copies of official documents, when certified by an official duly authorized by the Secretary of the Treasury, may be admitted in evidence with the same force and effect as original documents.

An examination of the different documents in collective Exhibit C, which is printed in the record, discloses that there is no formal certificate of a United States consul attached to two of them, as printed, but one is attached to the third, which is the contract above referred to and which, from the Government's argument, appears to be regarded by it as the important portion of the exhibit. No objection was made by counsel for the importer upon the specific ground of improper certification or verification, nor was any question raised as to the consul's certification.

Inasmuch as the lower court expressly finds that the sales made by the O. C. P. to the superphosphate works are the correct measure of value of the phosphate rock in question in Morocco for home consumption, we do not think that this case can properly be disposed of unless this contract, and perhaps the other documents in Exhibit C, are received in evidence and fully considered. While it is true that the importer's witness testified orally, without objection, to certain parts of said contract, we do not think that this affects the right of the Government to have the entire contract in evidence, and we are not prepared to say that said oral testimony covers all of the material portions of said contract.

Believing as we do that this evidence is necessary for a proper consideration of this entire case, we must reverse the court below and remand the case so that the case may be fully considered upon all of the material evidence properly offered.

We may add that the record shows that there are but two classes of sales upon which the importer relies to establish the value of the phosphate rock for home consumption in Morocco: (1) The sales to the said superphosphate works, amounting in 1927 to 12,671 tons; and (2) sales to individual farmers and farmer cooperative associations in Morocco, under certain restrictions, amounting to 501 tons.

With respect to these sales, the Customs Court, in its decision appealed from, said:

There are two classes of sales in the case at bar, and two levels of prices, for home consumption. There are the sales made to the superphosphate works and the sales made directly to the farmers at a lower price, but the sales made to the superphosphate works had to have a certain guarantee as to quality. We think the sales made to the superphosphate works are the correct measure of value.

While the court made a finding of fact of the foreign market value of the phosphate rock involved herein of $3.98 per ton, we think it is clear from the foregoing quotation that in making such finding the

court rejected sales made direct to farmers and farmer cooperative organizations as a proper basis for determining foreign market value. We are of the opinion that such rejection was justified, and that the sales to farmers and farmer cooperative organizations, under the terms and conditions disclosed by the record, do not constitute any substantial evidence of foreign market value.

The judgment of the Customs Court is *reversed* and the cause is *remanded* with directions to remand the same to the single justice for a new trial.

DISSENTING OPINION

GARRETT, Judge: I do not interpret the opinion of the court below in finding the price of $3.98 per ton, at which the raw phosphate rock was sold to the superphosphate manufacturer, to be the correct foreign value for appraisement, to have necessarily constituted a final rejection by it of the price at which sales were made and offered to be made to the farmers and farmers' cooperative organizations in Morocco.

I construe it rather to mean that as between two classes of sales in Morocco the court determined that the prices at which sales were made to the manufacturer constituted the correct yardstick, and that it did not treat the issue as being between all the sales in Morocco for consumption there and the sales for export to countries other than the United States.

If I am in error as to this and the former is the correct construction of the Customs Court's opinion, then, it seems to me, a question of law is presented, rather than one of fact, viz: As a matter of law does the price at which the phosphate rock was sold, or offered for sale, to the farmers of Morocco, constitute a foreign value in the sense of the Antidumping Law, or would it, if taken in connection with the price paid by the manufacturer?

The majority of the court see proper to express an opinion upon the sales to farmers, at this time. I am not now prepared to concur in the view which they express upon that subject, and feel that, since the cause is being remanded, that question should be treated as an open one which the court below should be at liberty to consider along with all the other facts and legal issues of the case. I do not feel that this question should be now adjudged and the other questions remanded with no intimation of our view upon any one of them. To the extent that the expression in the majority opinion may be treated as a foreclosure of that question, I respectfully dissent, because I think that all sales made and offered to be made in Morocco should be studied together, of course, in the light of the limitations and restrictions under which they were made and offered to be made, and from these sales, taken as a whole, it should be determined whether there is a Moroccan market value for home consumption which meets the statutory definition of foreign market value.